UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MR. & MRS. "M," Parents of "K.M.":
                                    :
        Plaintiffs,                 :
                                    :
V.                                  :    CASE NO. 3:05-CV-584(RNC)
                                    :
RIDGEFIELD BOARD OF EDUCATION,      :
                                    :
        Defendant.                  :

## RULING AND ORDER

Mr. and Mrs. "M" ("the parents"),[1] bring this suit against the Ridgefield Board of Education ("the Board") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq., seeking reimbursement for the cost of private school for their daughter, "K.M."[2] K.M. attended public school in Ridgefield through the first grade. Her parents then enrolled her in the Villa Maria Education Center ("Villa Maria"), a private school that specializes in educating children of average intelligence who have learning disabilities. Cross-motions for summary judgment have been filed. For the reasons that follow, both motions are granted in part and denied in part.

_____

[1] To protect the privacy of the minor plaintiff, the Court authorized the use of pseudonyms [doc. # 4].

[2] K.M. is an eight-year-old girl with a complex medical history including the insertion of a permanent shunt in her brain to combat hydrocephalus, allergic asthma, and migraine headaches. Despite her average intelligence, she has had difficulty learning to read, write, and do math, and was half a grade behind her peers by the end of first grade. She also struggles to deal with new people and places and has experienced mood swings, depression, and hostility toward her developmentally-normal twin sister.

I.  Facts

The administrative record discloses the following facts relevant to the parents' claims:

A.  Kindergarten, 2002 - 2003 School Year

Before K.M. started kindergarten in 2002, she was evaluated at the parents' request by the Board's speech therapist, psychologist, and occupational therapist.  Based on these evaluations, the PPT agreed that K.M. was developmentally-delayed and should receive an hour of occupational therapy each week during kindergarten.[3] She received those services and did reasonably well in kindergarten.

The first annual review of K.M.'s IEP was convened on May 29, 2003, two months beyond the statutorily-prescribed period of one year.  At the meeting, K.M.'s kindergarten teacher reported that K.M. had made good progress and was ready for first grade. K.M.'s occupational therapist reported that K.M. had mastered nearly all the 13 objectives in her IEP, had motor skills in the average range, and could be discharged from occupational therapy.  Her kindergarten teacher concurred, and the PPT agreed that K.M. could exit from special education services.  The parents had no objection to this but expressed concern about K.M.'s short-term memory.  The

_____

[3]  Tests administered to K.M. at that time showed that she did not need speech services but did need occupational therapy for difficulties with fine motor control.  The tests placed K.M.'s intelligence in the low-average range, but the Board's psychologist reported that K.M.'s ability was likely higher and that her scores had been depressed by a combination of fine motor difficulties and noncompliance.

PPT agreed that memory testing would be appropriate and suggested that it be done in the fall.  The parents agreed to this delay.

B. First Grade, 2003 - 2004 School Year.

K.M. entered first grade in September 2003.  Soon after the start of school, her parents were informed that K.M. was not participating fully in class and was having problems completing her work.  A literacy test in October found that K.M.'s skills had deteriorated since the end of kindergarten, placing her close to the bottom of her class in recognition of letter names, letter sounds, and sight words, as well as spelling and dictation.

In response to the parents' request, a PPT meeting was convened on October 20, 2003.  At the meeting, the parents discussed an appointment they had made for K.M. to undergo a neuropsychological evaluation at Yale in December.  None of the school officials at the meeting was authorized to commit resources for the Yale evaluation.  Within a week of the meeting, however, such a commitment was made by the Board's Director of Special Education.

Soon after the meeting, the parents informed the Director of Special Education that they were considering placing K.M. in private school, and asked her kindergarten and first grade teachers for a recommendation that would be necessary for her admission to Villa Maria.  The parents made it clear that they did not want K.M. to undergo any more tests before the Yale evaluation.

Another PPT meeting convened on December 5, 2003. K.M. was continuing to struggle in the classroom but was not receiving any special education services pending the Yale evaluation. As an interim measure, the Board recommended a "diagnostic placement" during which K.M. would receive 15 hours per week of special education instruction in language arts and math. Everyone agreed that the placement would continue until the results of the Yale evaluation were received. (See Bd. Ex. 22 at 5) (describing the PPT action as "Diagnostic Placement in Learning Center until evaluations completed").

In the company of a few other first graders, K.M. began to follow a regular schedule of special education and ordinary classroom instruction. The special education teacher supervised between 4 and 9 students from various grades at any one time and instructed K.M. in reading, writing, and math. K.M.'s test results remained weak through March, but her regular classroom teacher noted that K.M. seemed happier and more comfortable in school, had started asking for help when she needed it, and was more willing to participate in quiet reading time. By April, K.M.'s academic skills also began to show improvement, with her scores increasing from 4 to 17 (out of 200) sight words, 16 to 26 (out of 26) letter names, 3 to 31 (out of 40) letter sounds, 0.2 to 3.1 (out of 5) in spelling, and 5 to 25 (out of 37) in dictation.

The PPT reconvened in March to discuss the report of the

neuropsychological evaluation at Yale.  The report showed that K.M. had serious cognitive deficits for which she would continue to need special education services.[4]  In light of the Yale report, the PPT concluded that K.M. was eligible for special education services under the category "other health impaired," and developed an IEP requiring 16.25 hours per week of tuition in the learning center, 30 minutes per week of counseling, 30 minutes per week of occupational therapy, and 16.85 hours per week of regular classroom instruction.

The Yale report recommended that K.M. attend an educational program with particular attributes, including: a high level of structure, tuition during vacation periods, individual and small-group instruction, occupational therapy, counseling, use of a communication journal between teachers and parents, use of a dedicated workstation to reduce distractions, simple and concise instructions with extra time to complete assignments, a mixture of harder and easier tasks to maintain motivation, use of manipulatives, and organizational support such as color-coded books and consistent storage locations.

The Yale report did not opine on the appropriateness of K.M.'s

---

[4]  According to the Yale report, K.M.'s intelligence is in the average range, but she has significant deficiencies in visual-motor, fine motor, and spatial abilities, and attendant difficulties interpreting and organizing complex information. Consequently, she is easily overwhelmed and distracted, and struggles to interpret complex verbal commands, compute mental arithmetic, complete multistep tasks, and process large amounts of visual information.

public school program.  However, K.M.'s parents felt that the size of the classrooms, the number of children in each class, the presence of older children on different schedules in the special education classroom, and the visually-stimulating decoration of the rooms rendered it inappropriate for K.M. in view of her Yale-identified tendency to be overwhelmed and distracted.  In their view, and that of K.M.'s therapist, K.M. needed a physically smaller environment with fewer children, less visual stimulation and fewer distractions.  Accordingly, they requested an out-of-district placement at Villa Maria.

The Board felt that the Yale recommendations could be adequately addressed by a combination of regular classroom and special education instruction in its school.  As K.M.'s teachers testified, normal first grade teaching practice emphasized routine and consistency, simple instructions with mechanisms for checking student comprehension and a mix of hard and easy tasks to provide a sense of achievement.  The classroom teacher was already using manipulatives, giving K.M. extra time to complete assignments, and communicating regularly with the parents, and K.M.'s special education classes provided small-group instruction and the possibility for a dedicated workstation.  On this basis, the Board denied the parents' request for private placement.

In response to parental criticism, the PPT met on April 20 and revised the March IEP, making the goals and objectives more

specific, adding 30 minutes of occupational therapy per week and providing 6 hours of special education services and 30 minutes of occupational therapy for each of three weeks during the summer vacation. K.M.'s parents accepted the modified IEP as the best solution for the few remaining months of first grade, but notified the Board in May that they would send K.M. to Villa Maria for the 2004-2005 school year, and sought funding for the out-of-district placement.

On May 18, the Board notified the parents that the annual review meeting would be held on June 17 starting at 9:00 a.m. On June 9, K.M.'s parents sent an email asking the Board to delay the start of the June 17 meeting until 1:30 p.m. to enable their attorney to attend. The school immediately responded that it would not be possible to delay the meeting and still comply with the parents' request that the Director of Special Education attend. The school also noted that the occupational therapist would not be available to meet on June 17 after 12:30 p.m. K.M.'s mother replied by email. She requested that the Board find a time when both the Director and the parents' attorney would be able to attend and asked that the school call her to discuss an alternative time. The parents' attorney subsequently sent a letter to the school on June 11 reiterating the parents' request for rescheduling. (Exhibit B-46.)

The record does not reflect that the school responded to K.M.'s mother's email, or the lawyer's letter, or otherwise communicated with the parents or their attorney, until June 14. On that day, the school sent K.M.'s mother an email reiterating the difficulty of rescheduling with the Director of Special Education and asking whether the PPT could go ahead with the meeting on June 17. Apparently, this was the school's only attempt to follow up on K.M.'s mother's request to discuss an alternative time. There is no evidence that K.M.'s mother responded to the school's email.

On June 17, the PPT convened. The parents were not present. The Board went ahead with the meeting and formulated an IEP for the 2004-2005 school year without the parents' participation. It is unclear whether the school made any attempt to contact the parents before proceeding without them. The text of the minutes of the meeting includes the following handwritten note: "District Attorney notified parent attorney that meeting was to proceed." (Exhibit B-45A.) But the record provides no additional information concerning any such contact between the attorneys, and K.M.'s mother testified that the parents did not know the school intended to go ahead with the meeting until they received a copy of the IEP through the mail on June 21. (Nov. 8 Tr. at 188.)

The new IEP generally continued the April IEP into the 2004-2005 year, with the addition of half an hour of counseling.

The parents' request for out-of-district placement at Villa Maria was rejected on the ground that K.M. was making progress under the current IEP. Test results showed that she had made notable improvements since April, jumping from 17 to 93 (out of 200) sight words and from 25 to 31 (out of 37) in dictation, improving from 3.1 to 3.2 (out of 5) in spelling, and holding steady in letter name and letter sound recognition. Moreover, her teachers felt she was on the verge of a breakthrough and could proceed to second grade with special education support.

The record does not reflect how K.M.'s parents responded when they found out the PPT meeting had gone ahead without them. The parents did, however, send K.M. to the summer academy provided by the IEP, although K.M. attended for only one week before she became emotionally overwhelmed and had to be withdrawn from the program. K.M. also attended half an hour of occupational therapy provided by the Board each week. At the end of the summer, K.M.'s parents enrolled her at Villa Maria for the 2004-2005 school year. Intake evaluations performed in August placed K.M.'s math and language skills at the level of a child halfway through first grade.

On September 2, 2004, the parents requested a hearing before an independent hearing officer ("IHO") concerning the adequacy of the program offered by the Board in 2003-2004 and 2004-2005. After ten days of testimony from K.M.'s mother, teachers, counselors, and doctors, the IHO concluded that, although the Board had violated

some of the procedural requirements of the IDEA, it had nonetheless offered K.M. a FAPE for the 2003-2004 and 2004-2005 school years. Accordingly, the IHO denied the parents' request for reimbursement of the costs of private education. This appeal followed.

III. <u>Standard of Review</u>

Under the IDEA, judicial review of IHO decisions is "independent" but "circumscribed"; courts must give "due weight" to the factual and educational determinations of the hearing officer, "mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ., 397 F.3d 77, 82 (2d Cir. 2005) (internal quotations marks omitted, alteration in original). Courts do not, however, defer to an IHO's conclusions of law. <u>Id</u>.[5]

IV. <u>Discussion</u>

Whether K.M.'s parents are entitled to reimbursement involves a three-step inquiry:

> First, we examine whether the state has complied with the procedures set forth in the IDEA. . . . Second, we consider whether the IEP developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits. . . . If . . . the IEP

_____

[5]   IDEA actions in federal court are usually resolved on motions for summary judgment. However, the normal inquiry into whether there are genuine issues of material fact for a jury to resolve is replaced by judicial review of the administrative record under a preponderance of the evidence standard. See 20 U.S.C. § 1415(i)(2)(C)(iii)(2000).

> is procedurally or substantively deficient, we proceed to
> the third step and ask whether the private schooling
> obtained by the parents is appropriate to the child's
> needs.

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005)

(internal quotation marks and citations omitted).

A.   Procedural Compliance

The parents complain of five procedural violations.  They

contend that the Board: (1) failed to convene a PPT meeting to

review K.M.'s first IEP until May 29, 2002, more than a year after

the IEP was agreed to, in violation of the requirement that PPTs

meet "not less than annually," 20 U.S.C. § 1414(d)(4) (2000); (2)

failed to evaluate K.M. in "all areas of suspected disability"

before exiting her from special education in June 2003, in

violation of 20 U.S.C. § 1414(b)(3)(c) (2000); (3) conducted a PPT

meeting in the absence of any school official with the authority to

approve the evaluation by Yale, in violation of 20 U.S.C. §

1414(d)(1)(B)(iv)(III) (2000); (4) failed to follow proper

procedures for a "diagnostic placement" under state law; and (5)

formulated the 2004-2005 IEP at the meeting on June 17, 2004, in

the absence of the parents and their attorney, without taking

adequate steps to obtain parental input.

I conclude that the Board's failure to include the parents in

the development of the 2004-2005 IEP denied K.M. a FAPE for the

second grade, but that the Board's procedural errors during the

2003-2004 school year did not rise to the level of denying K.M. a FAPE for first grade.

1. <u>Parental Participation in the 2004-2005 IEP</u>

The IDEA mandates that parents be afforded "[a]n opportunity . . . to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1) (2000). The IHO concluded that the parents' absence from the PPT meeting on June 17, 2004, at which the IEP for 2004-2005 was developed, did not result in denial of a FAPE for three reasons: (1) the parents had notice of the meeting and chose not to attend; (2) the parents had participated fully in prior PPT meetings; and (3) the parents had already decided to remove K.M. from public school. I disagree with the IHO's legal analysis.

Federal regulations impose an affirmative obligation on the Board to "take steps to ensure that one or both of the parents . . . are present at each IEP Team meeting or are afforded the opportunity to participate, including . . . [s]cheduling the meeting <u>at a mutually agreed on time and place</u>." 34 C.F.R. § 300.322(a)(2)(2006)(formerly §345(a)(2)(2004))(emphasis added). Under the regulations, the Board was entitled to proceed without the parents only if it had been "unable to convince the parents that they should attend," 34 C.F.R. § 300.322(d)(2006)(formerly §

12

345(d)(2004)), and could produce "a record of its attempts to arrange a mutually agreed on time and place, such as . . . telephone calls . . . correspondence . . . and . . . visits made to the parent's home or place of employment," id.  See also 64 F.R. 12587 (1999)(explaining that "[t]he key factor in §300.345(a) is that public agencies effectively communicate with parents about the up-coming IEP meeting, and attempt to arrange a mutually agreed upon time and place for the meeting")(emphasis added); id. ("Section 300.345(d) . . . is intended to enable a public agency to proceed to conduct an IEP meeting if neither parent elects to attend, after repeated attempts by the public agency to ensure their participation.")(emphasis added).

The administrative record does not support a finding by a preponderance of the evidence that the Board satisfied its obligation to try to arrange the PPT meeting at a mutually convenient time.  The Board clearly had an opportunity to communicate with the parents about an alternative time.  As mentioned above, K.M.'s mother replied to the school's email of June 9 with her own email specifically requesting that the school call her to discuss an alternative time.  As far as the record shows, the school failed to act on this request.  Instead, it waited until June 14, then sent an email asking if the meeting could go ahead on June 17 without offering any alternative time. When K.M's parents did not respond, the Board took no action to

find out why.  This was a mistake.  The lack of a response to the email did not entitle the Board to assume that the parents were now willing to have the meeting go forward at 9:00 a.m. on the 17th. Rather, having received no response to the email, the burden remained on the Board to take steps to contact the parents to be sure that the meeting could go forward on the 17th and, if that proved not to be the case, to discuss a mutually agreeable alternative time.[6]  To be clear, I do not hold that the regulations require school boards to continue to accommodate an infinite number of parental requests for an alternative time.  The duty to take steps to find a mutually agreed on time assumes good faith attempts to agree by both sides.  But the record in this case is not one of repeated parental veto of suggested times.  Rather, the record reflects no effort at all by the Board to negotiate a mutually agreeable time for the meeting, despite the parents' express and timely request for further discussion.

Nor did the parents' participation at prior PPT meetings serve to relieve the Board of its obligation to consult them about the IEP for the new school year.  As the Second Circuit has recognized, "the regulations governing parental participation  . . . [require

---

[6] The IHO's finding that the parents chose not to attend the meeting on June 17 is at odds with the testimony of K.M.'s mother. Assuming the finding reflects a permissible decision by the IHO to decline to credit the mother's testimony, it does not absolve the Board of responsibility.  The burden remained with the Board to satisfy its obligation under the law to take affirmative steps to try to secure the important objective of having the parents participate in the meeting.

that] parents of a child with a disability are present at <u>each</u> IEP meeting or are afforded the opportunity to participate." <u>Cerra</u>, 427 F.3d at 192-93 (emphasis added). This is not a case in which the disputed IEP was developed in consultation with the parents over numerous meetings, and the parents happened not to attend the final meeting in the series. <u>Cf. id.</u> at 193 ("The [parents] had numerous opportunities to participate in meetings with respect to the identification, evaluation, and educational placement of the child . . . in preparation for the [relevant] school year"). Unlike the mother in <u>Cerra</u>, K.M.'s parents did not participate in any meeting "specifically focused on developing" K.M.'s 2004-05 IEP. The last meeting in which they participated was directed at making the best of the remaining months of K.M's 2003-2004 school year.[7]

The Board's procedural violation cannot be considered harmless error. K.M.'s mother testified that she might have changed her mind about placing K.M. out of district if the Board had been willing to act on the information provided in the Yale report to develop a program that would "help [K.M.] catch up for the year that she lost." (Nov. 8 Tr. at 191.) It is precisely "[b]ecause . . . parents and education professionals cannot always agree on an appropriate IEP for the child [that] states are required to . . .

---

[7]  If anything, the parents' record of active participation in meetings regarding K.M.'s education supports their claim that the Board should not have proceeded without them.

guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." Bd. of Educ. v. Schutz, 290 F.3d 476, 481 (2d Cir. 2002) (internal quotation marks and citation omitted). It follows that school authorities may not avoid their obligation to involve parents in decisions about their child's educational programming simply by speculating that the parents would challenge or reject the educators' recommendations.

The Board contends that conducting the June 17 meeting in the parents' absence did not result in denial of a FAPE unless it caused a loss of educational opportunity. (See Def.'s Mem. Supp. Mot. Summ. J. at 35.) I disagree. The Supreme Court has observed that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage . . . as it did upon the measurement of the resulting IEP against a substantive standard." Bd. of Educ. v. Rowley, 458 U.S. 176, 205 (1982). Consistent with this emphasis, the Second Circuit recently described the inquiry into whether a school district fulfilled its procedural obligations under the IDEA as "focus[ing] on whether the [parents] had an adequate opportunity to participate in the development of [the child's] IEP." Cerra, 427 F.3d at 192. Moreover, the Board's position is inconsistent with the great weight of authority in

other circuits.[8]

## 2. Procedural Errors Relating to 2003-2004 School Year

No IEP was developed for K.M.'s first grade until three months

before the end of the school year. The parents assert that the

---

[8] For example, the Sixth Circuit has articulated the appropriate standard as follows:

> Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process. . . . In addition, procedural violations that deprive an eligible student of an individualized education program or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA.

Knable v. Bexley City Sch. Dist., 238 F.3d 755, 765-66 (6th Cir. 2001)(internal citation omitted). The First, Third, Fifth, Eighth, and Ninth Circuits have used similar language. See Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 812 (5th Cir. 2003) (plaintiff must show that procedural errors "resulted in a loss of educational opportunity or infringed [the] parents' opportunity to participate in the IEP process."); C.M. v. Bd. of Educ., 128 Fed. Appx. 876, 881 (3d Cir. 2005) (per curiam)("[O]nly those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable."); M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 651-52 (9th Cir. 2005) (Gould, J. concurring) (Ninth Circuit consider[s] whether the procedural error resulted in a loss of educational opportunity or significantly restricted parental participation in the IEP formation"); Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 657 (8th Cir. 1999) ("Procedural deficiencies in the development of a child's IEP warrant rejecting the IEP only if they compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits." (internal quotation marks omitted)); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990) (IEP to be set aside only if there is a "rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."); but see DiBuo ex rel. DiBuo v. Bd. of Educ., 309 F.3d 184, 190 (4th Cir. 2002).

Board caused this delay by failing to adhere to a number of the IDEA's procedural requirements, and that K.M.'s education suffered as a result. The hearing officer found that, in each case, the parents' own choices were intertwined with the Board's decisions in such a way as to break the chain of causation between the Board's actions and any prejudice to K.M.'s education. I agree.

Even if the second PPT had been held within a year of the first – allowing the parents' concern about K.M.'s memory to emerge two months sooner – the parents' anxiety about K.M.'s emotional state would have precluded testing for the suspected disability before the fall; thus, institution of the special education services K.M. needed would have been delayed in any event. The parents' complaint about K.M.'s discharge from special education at the end of kindergarten fails for the same reason: the parents not only consented to the termination of services but also contributed to and endorsed the decision to postpone until the fall the tests that would have been necessary to confirm the suspected memory disability. The absence of the Director of Special Education from the PPT meeting at which the parents' requested an external evaluation by Yale did not delay K.M.'s evaluation by Yale because the December appointment had been set prior to, and was unaffected by, the PPT meeting. Finally, although the Board violated state regulations limiting "diagnostic placements" to eight weeks and mandating review meetings every two weeks during such placements,

see Conn. Admin. Code § 10-76d-14(b), the violations resulted from an agreement between the Board and the parents to defer further assessment of K.M.'s needs by the Board and to maintain K.M. in an ad hoc special education program until the independent evaluation by Yale.  Cf. Doe ex rel Doe v. Defendant I, 898 F.2d 1186, 1189 (6th Cir. 1990) (parent could not hold Board liable for not developing an IEP when he had requested that the school wait to see how well his son performed without intervention).

B.  Substantive Compliance

In addition to complying with the IDEA's procedural safeguards, an IEP must also be "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 181.  Having concluded that the Board's formulation of the 2004-2005 IEP without parental participation denied K.M. a FAPE for second grade, I need not consider whether the proposed second-grade IEP was substantively reasonable.  Cerra, 427 F.3d at 192 ("If . . . the IEP is procedurally or substantively deficient, we proceed to the third step." (emphasis added)).  Conversely, having concluded that procedural errors in 2003-2004 did not deprive K.M. of a FAPE for first grade, I must consider whether the April 2004 IEP was reasonably calculated to enable K.M. to receive educational benefits.  Id.

In assessing the adequacy of the benefit conferred by a program, the following principles are relevant:  first, no

particular level of achievement is mandated by the IDEA, which is satisfied if the school district "provides an IEP that is likely to produce progress, not regression, and . . . affords the student with an opportunity greater than mere trivial advancement." Id. at 195 (internal quotation marks omitted). Second, "a child's academic progress must be viewed in light of the limitations imposed by the child's disability." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997). Third, an IHO's conclusions about the educational appropriateness of an IEP are entitled to substantial deference in view of his or her "special expertise in making judgments concerning student progress," Cerra, 427 F.3d at 195 (internal quotations omitted), and may not be overturned "absent objective evidence in the record suggesting that the [IHO] has reached an erroneous conclusion." Id. at 196. In accordance with these principles, the IHO's determination that the April 2004 IEP was adequate must be affirmed.

In support of their assertion that the April IEP did not provide meaningful educational benefit, the parents observe that, although K.M. spent the winter of 2003-2004 receiving learning center assistance of the kind provided by the April 2004 IEP, she nonetheless performed very poorly on tests administered between October 2003 and March 2004.[9]   K.M.'s test results from October

_____

[9] The First, Third, and Ninth Circuits have held that it is improper to consider retrospective evidence of a student's performance in evaluating the reasonableness of an IEP. See Carlisle Area Sch. v. Scott P., 62 F.3d 520, 530 (3d Cir. 1995);

2003 through March 2004 were not good, but literacy tests conducted
in April and June 2004 support her teachers' testimony that she was
experiencing a breakthrough by the end of the year, advancing
approximately half a grade in three months.

The parents also challenge the adequacy of the April 2004 IEP
on the ground that it aimed only to advance K.M. to a mid-first-
grade level of achievement by the end of the school year.
Advancement of half a grade is not insignificant.  K.M.'s teachers
testified that K.M. was not the weakest performer in her class and
that, due to the typically wide range of developmental differences
between children of first grade age, it is not unusual for a child
with her literacy scores to proceed to second grade.  The record
contains no expert testimony to the contrary.

Finally, the parents attack the adequacy of the services
offered by the Board for the summer of 2004.  The April IEP

_____

Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990);
Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999).  The Second
Circuit has not yet joined the debate on this issue. See D.F. ex
rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 599 (2d Cir.
2005) (recognizing the controversy but declining to rule on it).
However, the Second Circuit recently relied on retrospective
evidence to uphold a parent's choice of private placement. See
Frank G. v. Bd. of Educ., 459 F.3d 356, 366 (2d Cir. 2006) ("[Minor
plaintiff's] social and academic progress, and his score on the
Stanford Achievement Test, support the appropriateness of the
placement.").  In the absence of Second Circuit precedent to the
contrary, or objection from the parties, the Court may consider the
parents' evidence as to K.M.'s progress, or lack thereof, under the
challenged IEP. Cf. Rowley, 458 U.S. at 207 n.28 ("[T]he
achievement of passing marks and regular advancement from grade to
grade will be one important factor in determining educational
benefit.").

provided that K.M. would receive six hours of reading and math support and thirty minutes of occupational therapy per week for three weeks under the auspices of the Board's summer academy. The parents accepted this IEP and took advantage of the services it provided until K.M.'s emotional reactions necessitated her withdrawal. The IHO determined that the Board's summer program was adequate, and there is no objective evidence in the record that casts doubt on the IHO's assessment.

Accordingly, I affirm the IHO's conclusion that K.M.'s first grade program provided an adequate educational benefit, and that the Board did not deny K.M. a FAPE in 2003-2004.

C.    The Villa Maria Placement

Because K.M.'s parents have established that the Board denied K.M. a FAPE for the 2004-2005 school year, it is necessary to determine whether the private educational services that the parents obtained for K.M. were appropriate. Cerra, 427 F.3d at 192. In making this assessment, I apply "the same considerations and criteria that apply in determining whether the School District's placement is appropriate," except that "an appropriate private placement need not meet state education standards or requirements," and parents "may not be subject to the same mainstreaming requirements as a school board." Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006).

Villa Maria is approved by the Connecticut Department of Education to provide special education services, and specializes in educating children, like K.M., who have average intelligence but suffer from learning disabilities. It provides a learning environment that satisfies the Yale recommendations for small group instruction, structure, consistency, and minimization of the potential for visual and auditory overstimulation. The Board contends that the placement at Villa Maria was not appropriate because Villa Maria does not admit nondisabled children. As just mentioned, however, parental placements are not subject to the IDEA mainstreaming requirement. Frank G., 459 F.3d at 364. No other objections has been raised by the Board. Therefore, the Villa Maria placement was appropriate.

III. Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment [doc. # 14] is granted in part and denied in part, and defendant's motion for summary judgment [doc. # 17] is also granted in part and denied in part.

Plaintiffs shall file and serve a motion for tuition reimbursement and attorneys' fees, supported by a memorandum of law and one or more affidavits, **on or before April 30, 2007.** Defendant shall respond **on or before May 30, 2007.** The decisions whether to award tuition reimbursement and attorneys' fees, and, if so, the extent of any such awards, are entrusted to the Court's discretion.

20 U.S.C. § 1412(a)(10)(C)(ii) (2000)("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of [private] enrollment."); 20 U.S.C. § 1415(i)(3)(B)(i) (2000)("In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability.") "It is well established," moreover, "that 'equitable considerations are relevant in fashioning relief' under the IDEA." <u>M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.</u>, 226 F.3d 60, 68 (2d Cir. 2000) (quoting <u>Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 374 (1985)). Accordingly, the parties are requested to address any equitable factors that should be taken into account in fashioning appropriate relief. For instance, it is unclear whether the parents, on learning that the meeting had taken place without them on June 17, 2004, promptly objected and requested another meeting. Failure to take that action might be considered unreasonable within the meaning of 20 U.S.C. § 1412(a)(10)(C)(iii)(III)(2000).

It is so ordered this 30th day of March 2007.


_____/s/_____
      Robert N. Chatigny
   United States District Judge


24